1

2

3

4

5

6

7

8                                IN THE UNITED STATES DISTRICT COURT

9                              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TERRY LEE STONE,

11                    Petitioner,                    No. 2:11-cv-1605 KJN P

12          vs.

13   WARDEN KNIPP,                                    ORDER

14                    Respondent.

15   _____/

16   I.  Introduction

17                  Petitioner is a state prisoner, proceeding without counsel, with an application for

18   petition of writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner claims that the trial

19   court failed to conduct a competency hearing.  The parties have consented to proceed before the

20   undersigned for all purposes.  See 28 U.S.C. § 636(c).  Presently before the court is respondent's

21   motion to dismiss the pending habeas petition as barred by the statute of limitations.  Petitioner

22   filed an opposition to the motion and respondent filed an amended reply.[1]  For the reasons set

23   forth below, the undersigned finds that respondent's motion to dismiss should be granted.

24   _____

25          [1] On October 26, 2011, respondent filed a request for leave to file an amended reply.
     (Dkt. No. 17.)  The amendment provided CM/ECF pagination for extensive mental health
     records submitted as an exhibit to the reply.  No substantive changes were made to the amended
26   reply.  Respondent's request is granted.

                                                    1

II. <u>Statutory Tolling</u>

Petitioner does not dispute that the statute of limitations period expired before filing the instant petition.  However, to assist the court in evaluating petitioner's claim that he is entitled to equitable tolling, the court first addresses the issue of statutory tolling.

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") was enacted.  Section 2244(d)(1) of Title 8 of the United States Code provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  Section 2244(d)(2) provides that "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the limitations period.  28 U.S.C. § 2244(d)(2).

The relevant chronology of this case is as follows:

1.  Petitioner was convicted on May 5, 2003, of felony vandalism and making terror threats.  (Respondent's Lodged Document ("LD") 1.)  On June 6, 2003, petitioner was sentenced to twenty-five years to life with the possibility of parole.  (LD 1.)  Another twenty-five year to life sentence was stayed pursuant to California Penal Code § 667(b).  (LD 1.)

1          2.  Petitioner appealed, and on August 3, 2004, the California Court of Appeal,

2   Third Appellate District, affirmed the judgment.  (LD 2.)

3          3.  Petitioner filed a petition for review in the California Supreme Court.  (LD 3.)

4   The California Supreme Court denied the petition for review without comment on October 13,

5   2004.  (LD 4.)

6          4.  Petitioner filed no post conviction collateral challenges in state court.

7          5.  Pursuant to Rule 3(d) of the Federal Rules Governing Section 2254 Cases, the

8   instant action was constructively filed on June 10, 2011.  (Dkt. No. 1.)

9          The statute of limitations begins to run when the petitioner's criminal judgment

10  becomes final.  The California Supreme Court denied the petition for review on October 13,

11  2004.  (LD 4.)  Petitioner's conviction became final ninety days later, on January 11, 2005, when

12  the time for seeking certiorari with the United States Supreme Court expired.  <u>Bowen v. Roe</u>, 188

13  F.3d 1157 (9th Cir. 1999).  The AEDPA statute of limitations period began to run the following

14  day, on January 12, 2005.  <u>Patterson v. Stewart</u>, 251 F.3d 1243, 1246 (9th Cir. 2001).  Absent

15  tolling, petitioner's last day to file his federal petition was on January 12, 2006.

16         Petitioner filed no state post-conviction collateral challenges to his conviction.

17  Therefore, the statute of limitations period expired on January 12, 2006.  Petitioner filed the

18  instant action on June 10, 2011, over five years after the limitations period expired.  Accordingly,

19  this action is time-barred unless petitioner can demonstrate that he is entitled to equitable tolling.

20  III.  <u>Equitable Tolling</u>

21         In the petition, petitioner states that he "was unable to file this petition within the

22  AEDPA time limits due to mental instability."  (Dkt. No. 1 at 5.)  Petitioner provides the

23  following facts:

24              Petitioner is an enhanced outpatient inmate, and has a lifetime of
              hearing voices and seeing things.  Petitioner could not possibly file
25              any petition due to his mental health condition.

26  (Dkt. No. 1 at 5.)  In his opposition to the motion, petitioner states that he is a developmentally

1   disabled person who has been in the Enhanced Outpatient Program ("EOP") and CCCMS[2]

2   Mental Health Care System in the county jail and state prison since 2003.  (Dkt. No. 13 at 5.)

3   Petitioner provided medical records demonstrating that he has been diagnosed with

4   Schizophrenia, Paranoid Type, and depression, and was prescribed antipsychotic drugs.  (Dkt.

5   No. 13 at 15-20.)

6          Respondent argues that petitioner failed to provide factual details as to how any

7   mental impairment prevented petitioner from timely challenging the 2003 conviction.  Moreover,

8   respondent contends that medical records demonstrate petitioner was functioning, stable on

9   medications, and even held a job as a porter.  (Dkt. No. 18 at 5.)

10         a. <u>Legal Standards</u>

11         In <u>Holland v. Florida</u>, 130 S. Ct. 2549, 2560, 2562, 2564 (2010), the Supreme

12  Court recognized that the AEDPA statute of limitations "may be tolled for equitable reasons"

13  when the petitioner has made a showing of "extraordinary circumstances."  To be entitled to

14  equitable tolling, petitioner must demonstrate "(1) that he has been pursuing his rights diligently,

15  ─────────────────

16      [2]       CCCMS is an acronym for the Correctional Clinical Case
            Management System and inmates designated to this level of care
17          are those "whose symptoms are under control or in partial
            remission and can function in the general prison population,
18          administrative segregation, or segregated housing units."  <u>Coleman</u>
            <u>v. Schwarzenegger</u>, 2009 WL 2430820, *15 n.24 (E.D. Cal. 2009).
19
    <u>Washington v. McDonald</u>, 2010 WL 1999469 (C.D. Cal. Feb. 19, 2010).
20
            The EOP level of care is for inmates who suffer "Acute Onset or
21          Significant Decompensation of a serious mental disorder
            characterized by increased delusional thinking, hallucinatory
22          experiences, marked changes in affect, and vegetative signs with
            definitive impairment of reality testing and/or judgment," and who
23          are unable to function in the general prison population but do not
            require twenty-four hour nursing care or inpatient hospitalization.
24
    <u>Coleman</u>, 2009 WL 2430820, *15 n.24 (citation omitted).  The Mental Health Crisis Bed
25  ("MHCB") Placement is "for inmates who are markedly impaired and/or dangerous to others as a
    result of mental illness, or who are suicidal, and who require 24-hour nursing care."  <u>Id.</u> (citation
26  omitted).

1  and (2) that some extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S.

2  408, 418 (2005).  The Ninth Circuit explained:

> To apply the doctrine in "extraordinary circumstances" necessarily
> suggests the doctrine's rarity, and the requirement that
> extraordinary circumstances "stood in his way" suggests that an
> external force must cause the untimeliness, rather than, as we have
> said, merely "oversight, miscalculation or negligence on [the
> petitioner's] part, all of which would preclude the application of
> equitable tolling.

7  Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir. 2009) (internal citation omitted),

8  cert. denied, 130 S. Ct. 244 (2009).  It is petitioner's burden to show that he is entitled to

9  equitable tolling.  Espinoza-Matthews v. People of the State of California, 432 F.3d 1021, 1026

10  (9th Cir. 2005).  "[T]he threshold necessary to trigger equitable tolling [under AEDPA] is very

11  high, lest the exceptions swallow the rule."  Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003)

12  (citation omitted).

13  Under some circumstances, a mental illness can represent an extraordinary

14  circumstance justifying equitable tolling.  See Laws v. Lamarque, 351 F.3d 919, 923 (9th Cir.

15  2003) (remanded to determine whether mental illness prevented petitioner from timely filing).  In

16  Bills v. Clark, 628 F.3d 1092 (9th Cir. 2010), the Court of Appeals for the Ninth Circuit

17  determined that courts should use a two part test to evaluate the application of equitable tolling in

18  cases where petitioner suffers from a mental impairment.  Id.

> (1)  First, a petitioner must show his mental impairment was an
> "extraordinary circumstance" beyond his control, see Holland, 130
> S. Ct. at 2562, by demonstrating the impairment was so severe that
> either
>
> > (a) petitioner was unable rationally or factually to
> > personally understand the need to timely file, or
> >
> > (b) petitioner's mental state rendered him unable
> > personally to prepare a habeas petition and
> > effectuate its filing.  [Footnote omitted]
>
> (2)  Second, the petitioner must show diligence in pursuing the
> claims to the extent he could understand them, but that the mental
> impairment made it impossible to meet the filing deadline under

1    the totality of the circumstances, including reasonably available
2    access to assistance.  See id.

3    Bills, 628 F.3d at 1100.

4    A petitioner who "makes a good-faith allegation that would, if true, entitle him to

5    equitable tolling" may be entitled to an evidentiary hearing.  Roy v. Lampert, 465 F.3d 964, 969

6    (9th Cir. 2006) (quoting Laws, 351 F.3d at 919).  However, a district court is not obligated to

7    hold an evidentiary hearing to further develop the factual record, even when a petitioner alleges

8    mental incompetence, when the record is sufficiently developed, and it indicates that the

9    petitioner's mental incompetence was not so severe as to cause the untimely filing of his habeas

10   petition.  Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010).

11   b.  Analysis

12   In the instant case, the relevant period is between January 12, 2005, when the one-

13   year limitations period began, and June 10, 2011, the date the instant petition was constructively

14   filed.  See Laws, 351 F.3d at 923 ("Laws was adjudicated competent to stand trial in 1993,

15   notwithstanding evidence of serious mental illness.  But that determination has little bearing on

16   his competence vel non during the period 1996-2000[,]" . . . "the years when his petitions should

17   have been filed.")

18   With his opposition, petitioner provided medical records from 2005 to 2008,

19   demonstrating petitioner was diagnosed with Schizophrenia, Paranoid Type, and Depression, and

20   was prescribed antipsychotic medications.  (Dkt. No. 13 at 13-20.)[3]  These records reflect

21   petitioner was admitted to a Mental Health Crisis Bed on four separate occasions, from:  (1)

22   August 23, 2006, to August 28, 2006; (2) November 15, 2007, to November 19, 2007; (3) May

23   29, 2008, to June 5, 2008; and (4) June 25, 2008, to June 30, 2008.  (Dkt. No. 13 at 15-16, 19-

24   20.)  It appears petitioner was released from these MHCB admissions to the general population.

25
26   [3]  The medical records provided by petitioner with his petition are from 2000 and 2001,
     outside the relevant period.  (Dkt. No. 1.)

1  Petitioner's releases on June 5, 2008, and June 30, 2008, were to the EOP level of care. (Dkt.

2  No. 13 at 19, 20.)

3         Petitioner also provided copies of classification committee actions for 2008

4  through 2010. The 2008 classification noted that:

5         Accommodation for the purpose of achieving effective
       communication was required. Simple English was used.
6         Questions were repeated for clarification. [Petitioner] participated
       in committee action, stated that he understood, and agreed with the
7         recommendations to our satisfaction that he understood what was
       said in committee. A staff assistant was utilized to achieve
8         effective communication due to [petitioner's] EOP level of care.

9  (Dkt. No. 13 at 21.) However, for the 2009 and 2010 classification committee actions, no

10  accommodation for the purposes of communication was required. (Dkt. No. 13 at 22-23.) On

11  January 13, 2009, petitioner was removed from the EOP level of care and placed into the

12  CCCMS program. (Dkt. No. 13 at 22.)

13         Defendants provided authenticated mental health records for petitioner's treatment

14  from 2003 to 2011. The January 10, 2005 progress note, issued just prior to the start of the

15  relevant period, stated that petitioner "considered himself symptom free," and sought to be taken

16  off his medications. (Dkt. No. 16-1 at 3.) The medical professional stated that "apparently

17  symptoms in remission," and that petitioner "speaks clearly and coherently." (Id.) On March 18,

18  2005, Dr. Fratini, Ph.D., noted that petitioner "has sufficient knowledge/ability for self-care;

19  prison rules and prison protocol." (Dkt. No. 16-3 at 19, 21.)[4] On May 25, 2005, plaintiff was

20  noted to be "alert, oriented, organized, [and] cooperative." (Dkt. No. 16-1 at 9.) On June 19,

21  2005, plaintiff reported he was "doing alright; things are a lot better since CT and meds

22  [change]." (Dkt. No. 16-1 at 6.) Petitioner was assessed as stable on current medications. (Id.)

23

24      [4] On March 24, 2005, progress notes reflect petitioner was evaluated for dementia. (Dkt.
    No. 16-1 at 15.) Petitioner was "polite, sincere, cooperative, [and] eager during evaluation
25  process." (Id.) The [a]ssessment data suggest [petitioner] shows signs of mild cognitive
    impairment. (Id.) Petitioner previously received a passing score on the cognitive test on
26  November 21, 2003. (Dkt. No. 16-2 at 38.)

On September 11, 2005, petitioner reported that the Zyprexa removed A/H."[5]  (Dkt. No. 16-1 at 5.)  On October 12, 2005, plaintiff was "doing well on meds by self report," "no recurrence of A/H," and there was "no evidence of psychosis."  (Dkt. No. 16-1 at 5.)  Petitioner was again assessed as stable.  (Id.)  On December 6, 2005, petitioner reported that "[t]he Zyprexa took [his] voices away; Remeron took [his] depression away," and "I'm all right."  (Dkt. No. 16-1 at 4.)  The medical professional noted petitioner was "stable on current med[ications]."  (Id.)

Petitioner was employed as a porter, (dkt. no. 16-1 at 5), and obtained his G.E.D. while housed in federal prison.  (Dkt. No. 16-6 at 5.)

The undersigned also reviewed the subsequent mental health records for the years 2006-2011, after the statute of limitations period expired.  Petitioner was diagnosed with a serious mental illness, and he was seen frequently by professionals in the psychiatric department.  At times, petitioner had difficulties requiring crisis care, including for suicidal ideation, but was primarily treated on an outpatient basis and given appropriate medications, except when petitioner refused medications.  However, a showing of mental illness alone will not necessarily toll the limitation period because most mental illnesses are treatable, and with proper treatment many sufferers are capable of managing their own affairs.  See Miller v. Runyon, 77 F.3d 189, 192 (7th Cir. 1996) ("When his illness is controlled he can work and attend to his affairs, including the pursuit of any legal remedies that he may have.").

The records reflect varying evaluations of petitioner's cognitive functions.  On June 14, 2006, petitioner's cognition was marked as:

| | | |
|---|---|---|
| Fund of information | > | OK, but |
| Intellectual functioning | > | preoccupied |
| | | |
| Reality Contact | - | able to function |
| Thought Quality | - | poor |

(Dkt. No. 16-6 at 10.)  Petitioner was diagnosed as Schizophrenic, Paranoid.  (Dkt. No 16-6 at

_____

[5]  It appears A/H stands for auditory hallucinations.

11.)  On October 31, 2006, petitioner's treatment team noted that petitioner was "preoccupied," "stable structured delusional system," and "able to function."  (Dkt. No. 16-6 at 7.)  Petitioner was again diagnosed with Schizophrenia, Paranoid.  (Dkt. No. 16-6 at 8.)  Dr. Musina noted that petitioner complained of a hallucination, "however [inmate] coping with that.  Programming well.  [Inmate] remains on CCCMS program."  (Dkt. No. 16-6 at 8.)  Petitioner was stable on his medications.  (Dkt. No. 16-6 at 9.)  The "evaluations indicated that the [inmate] coping well with his mental disease and able to function being on CCCMS program."  (Dkt. No. 16-6 at 9.)

On October 16, 2007, none of the cognition boxes on the treatment form were marked, but the following notes were added:

> Attention - Doesn't retain material when reading
> Memory - Complains of impaired memory

(Dkt. No. 16-6 at 5.)  The 2007 treatment team diagnosed petitioner with Schizophrenia, Paranoid Type.  (Dkt. No. 16-6 at 6.)

On November 1, 2008, petitioner's treatment team marked all of these cognition categories as within normal limits.  (Dkt. No. 16-6 at 2.)  Petitioner's treatment team diagnosed petitioner with Psychotic Disorder NOS, polysubstance dependence, ASPD, and seizure disorder. (Id.)  However, on November 18, 2008, the following notes concerning cognition were entered:

> Function of information - Sixth Grade
> Intellectual functioning - below average
> Concentration - Fair
> Attention - poor retention
> Memory - Impaired Memory

(Dkt. No. 16-5 at 50.)  The diagnosis was the same as the diagnosis provided on November 1, except for the additional diagnosis of "malingering -- exaggeration of symptoms."  (Dkt. No. 16-5 at 51.)

On February 3, 2009, and February 2, 2010, each cognition category was again marked within normal limits.  (Dkt. No. 16-5 at 40; 45.)  Petitioner was diagnosed as Psychosis, NOS (rule out Delusional Disorder, Paranoid Type), Polysubstance Dependence, and ASPD.

(Dkt. No. 16-5 at 40; 46.)  But on February 1, 2011, petitioner's cognition was noted as follows:

> Function of information - within normal limits
> Intellectual functioning - within normal limits
> Concentration - Poor
> Attention - Poor
> Memory - Poor to Fair

(Dkt. No. 16-5 at 37.)  Petitioner was diagnosed with Schizophrenia, Paranoid Type, Polysubstance Dependence, and Antisocial Personality Disorder ("ASPD").  (Dkt. No. 16-5 at 38.)

Petitioner's GAF[6] scores ranged from a low of 35 on November 15, 2007 (dkt. no. 16-6 at 30), to a high of 63 on July 31, 2009 (Dkt. No. 16-5 at 24).  The low score of 35 was unusual for petitioner; most of petitioner's GAF scores were recorded in the 51-60 range.[7]  In addition, the score of 35 was received on the day petitioner was admitted "to MHCB due to severe auditory hallucinations that lead to suicidal thoughts."  (Dkt. No. 13 at 16.)

---

[6]  "GAF" is an acronym for "Global Assessment of Functioning," a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004).  A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  Id.  A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers.)  Id.  A 41-50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning.  A GAF of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.)" Id.

[7]  A GAF score of 52 was recorded on October 20, 2009, February 2, 2010, January 14, 2010, and February 2, 2010.  (Dkt. No. 16-5 at 42; 16-6 at 15, 17, 27.)  Petitioner was assessed a GAF score of 55 on three occasions, April 23, 2009, July 20, 2009, and February 2, 2011 (Dkt. No. 16-5 at 5, 25, 26, 38.)  On November 19, 2007, a GAF score of 58 was recorded.  (Dkt. No. 16-6 at 30.)  A GAF score of 60 was recorded on October 31, 2006, July 8, 2010, and April 27, 2011.  (Dkt. No. 15-5 at 1, 12; 16-6 at 8.) Petitioner was assessed a GAF score of 60+ on October 8, 2009.  (Dkt. No. 16-5 at 23.)  On September 23, 2010, petitioner received a GAF score of 62. (Dkt. No. 16-5 at 10.)

Despite petitioner's mental illness, medical records for the period following the expiration of the statute of limitations reflect that petitioner was able to function.  On September 1, 2006, petitioner said he had improved with new medications.  (Dkt. No. 16-4 at 44.)  On September 21, 2006, Dr. Musina, Ph.D., noted that petitioner was alert and oriented, and told petitioner "that his condition is fair, and as he is programming well, he is not qualified for EOP."  (Dkt. No. 16-4 at 43.)  On December 6, 2006, plaintiff presented as cooperative.  Dr. Musina, Ph.D., noted petitioner "has structured delusional system," and scheduled petitioner for a 90 day follow-up.  (Dkt. No. 16-4 at 38.)  On November 24, 2007, petitioner presented as relaxed, well-oriented, and "does not feel need for medications."  (Dkt. No. 16-4 at 23.)  On July 5, 2008, petitioner was alert, well-oriented, and appeared stable.  (Dkt. No. 16-4 at 3.)  On August 16, 2008, Dr. Hoffman stated petitioner "appears to set limits for himself and knows when to 'ignore the voices.'"  (Dkt. No. 16-3 at 43.)  On September 13, 2008, Dr. Hoffman noted petitioner was "functioning well despite strongly endorsed delusions."  (Dkt. No. 16-3 at 41.)

On November 18, 2008, Dr. Leigh, Ph.D., noted that petitioner was housed in general population and cared for under CCCMS until 2008.  (Dkt. No. 16-5 at 48.)  Thus, it appears petitioner was not under the EOP level of care until 2008.  (Id.)  On December 23, 2008, Dr. Vuskovic saw petitioner for a follow-up psych evaluation.  (Dkt. No. 16-3 at 32.)  Petitioner reported he was "doing ok" and did not want medications.  (Id.)

A medical record dated February 6, 2009, noted that petitioner was off psychotropic medications since July 15, 2008 (only briefly), and September 22, 2006 briefly.  (Dkt. No 16-5 at 28.)  Petitioner was in EOP in 2008, but dropped from EOP on January 13, 2009.  (Dkt. No. 16-5 at 28.)  On July 31, 2009, petitioner stated that he tried to work out five days a week due to his "anxieties and frustrations."  (Dkt. No. 16-5 at 24.)  Dr. Lanzano noted petitioner was "alert and oriented in three spheres," "[t]hought processes were linear, logical and goal directed," "[t]hought content revealed no evidence of psychotic process," and "[j]udgment and insight appear to be fair, cognition intact."  (Id.)

11

1         Moreover, psychiatrist Dr. Abrams opined that petitioner was malingering (Dkt.

2   No. 16-5 at 28), and Dr. French suggested that petitioner may be fabricating symptoms (dkt. no.

3   16-5 at 33).  (<u>See also</u> Dkt. No. 16-5 at 44.)  On January 8, 2009, Dr. French assessed petitioner

4   as having "self-induced schizophrenia."  (Dkt. No. 16-5 at 33.)  But on April 23, 2009, Dr.

5   Abrams assessed petitioner as

6           a heroin and crack addict most of his post-childhood life, has a
               severe personality disorder with many signs of a psychotic
7           disorder, most likely induced by his polysubstance abuse over
               many years (with probable significant brain impairment) and
8           severe emotional immaturity and impulsivity impairing his
               judgment.

9

10  (Dkt. No. 16-5 at 35.)

11        In 2010 and 2011, petitioner also refused psychotropic medications, against

12  medical advice.  (Dkt. No. 16-5 at 5-6; Dkt. No. 16-5 at 11.)  Petitioner believed the government

13  was monitoring his mind and causing him to hear voices.  (Dkt. No. 16-5 at 5.)  On March 4,

14  2011, petitioner reported continued delusions, but was not taking medications.  (Dkt. No. 16-5 at

15  4.)  Dr. Davison noted that petitioner was "functioning well, refuses psychotropic medication,

16  does not present a discipline problem."  (Dkt. No. 16-5 at 5.)

17        On December 10, 2010, petitioner started a different job -- cleaning on the yard.

18  (Dkt. No. 16-5 at 7.)  Petitioner was a talented artist, including tattoo artist, and medical

19  professionals encouraged petitioner to develop his artistic skills, and use art as a diversion from

20  his mental illness.  (Dkt. No. 16-5 at 4, 50; 16-6 at 20.)  On September 23, 2010, petitioner

21  presented a print-out from the internet which petitioner claimed was written by a man who "is

22  going through the exact same thing that [petitioner was] going through."  (Dkt. No. 16-5 at 10;

23  18-20.)

24        Thus, review of the medical records confirms that petitioner was routinely seen on

25  an outpatient basis for his mental health care issues, and that petitioner was stable on the

26  medications provided, but also opted not to take psychotropic medications.  Even when petitioner

1    refused medications, he reported he was "doing okay."  (Dkt. No. 16-3 at 32.)  While petitioner

2    periodically suffered episodes requiring crisis care, these episodes were not frequent.  These

3    infrequent episodes do not render petitioner's mental impairment so severe that he was unable to

4    pursue his legal remedies for most of the relevant period.  During the majority of the relevant

5    period, petitioner was assigned to the CCCMS level of care, which "suggests that petitioner was

6    able to function despite his mental problems."  Washington, 2010 WL 1999469, at *2.

7               In addition, as noted by respondent, petitioner provided no factual allegations to

8    demonstrate his mental illness was so severe that he was unable to understand the need to timely

9    file or that the illness rendered him unable to prepare a habeas petition and file it.  During the

10   time the statute of limitations period was running, medical records demonstrate that petitioner

11   was diagnosed with a serious mental illness, but petitioner was successfully medicated,

12   particularly in 2005.  In addition, although petitioner was prescribed psychotropic medications,

13   including antidepressant and antipsychotic medications, there is no indication that petitioner was

14   being treated for incompetence or being specially housed due to his mental health issues.  Rather,

15   it appears petitioner was housed in the general population except for those infrequent periods he

16   received crisis care.  The medical records do not demonstrate a medical incapacity so severe that

17   it prevented petitioner from understanding and acting on his rights.  Petitioner was generally

18   oriented, able to communicate, and able to understand communications by others.

19              Thus, while petitioner suffered from a serious mental illness, including auditory

20   hallucinations, during the relevant period, petitioner failed to demonstrate that his mental

21   impairment was so severe that he was unable to either understand the need to file or to personally

22   prepare and file a habeas petition from 2005 to 2011.  Accordingly, petitioner does not meet the

23   first prong of the Bills test.

24              But even if petitioner's mental illness was so severe as to meet the first prong of

25   Bills, petitioner failed to address the second prong issue of diligence.  Petitioner "must diligently

26   seek assistance and exploit whatever assistance is reasonably available."  Bills, 628 F.3d at 1100.

1   A petitioner may satisfy the diligence prong if "the petitioner's mental impairment prevented him

2   from locating assistance or communicating with or sufficiently supervising any assistance

3   actually found." Id. But, as the Supreme Court noted in Holland, the diligence requirement is

4   not maximum diligence but rather reasonable diligence. Id. Thus, the court must examine

5   whether, given petitioner's impairments, he was sufficiently diligent.

6          Here, petitioner alleged no facts showing that he attempted to obtain assistance in

7   order to file a timely petition, or that his alleged mental problems prevented him from locating or

8   communicating with others for assistance. Petitioner must do more than simply assert his mental

9   impairments to establish that he is entitled to equitable tolling for a delay of over five years.

10  Review of the medical records demonstrate that petitioner was able to communicate clearly with

11  medical professionals concerning his health issues. Petitioner was employed for at least part of

12  the relevant period, exercised, and worked on his art. Petitioner has alleged no facts

13  demonstrating a causal connection between his alleged mental illness and his inability to file a

14  timely petition. "Without any allegation or evidence of how petitioner's symptoms actually

15  caused him not to be able to file despite his diligence, the court cannot find that he is entitled to

16  equitable tolling." Taylor v. Knowles, 2009 WL 688615, at *6 (E.D. Cal. March 13, 2009), aff'd,

17  368 Fed. Appx. 796 (9th Cir. 2010) (no equitable tolling where petitioner failed to show his

18  auditory hallucinations, severe depression, and anxiety "actually caused him not to be able to file

19  despite his diligence"); see Howell v. Roe, 2003 WL 403353, *4 (N.D. Cal. Feb. 20, 2003)

20  (rejecting equitable tolling where petitioner's suicidal nature and depression did not make him

21  mentally incompetent).[8] Here, petitioner failed to allege how his condition interfered with his

22  ability to timely file the instant petition. Petitioner presented no evidence about what he did in an

23

24          [8] Unlike the petitioners in Taylor and Howell, petitioner did not appear to file other
    pleadings or lawsuits. Petitioner did not file any collateral challenges to his conviction, and the
25  instant action is the only case noted in CM/ECF records for the Eastern District. However,
    petitioner did file a coherent handwritten petition in the instant action, as well as a timely and
26  coherent opposition to respondent's motion to dismiss.

1   attempt to be diligent in protecting his rights.  Thus, petitioner has not shown that he acted

2   diligently.

3             The medical records provided demonstrate that petitioner suffers from auditory

4   hallucinations and a serious mental illness.  However, petitioner's conclusory statement that he

5   suffers from mental illness and receives mental health care while incarcerated is insufficient to

6   demonstrate that petitioner is entitled to equitable tolling for the over five year delay in filing the

7   instant petition.  Accordingly, this court finds that petitioner has failed to demonstrate that he is

8   entitled to equitable tolling, and respondent's motion to dismiss is granted.

9   IV.  Constitutionality of AEDPA

10            The majority of petitioner's opposition is spent arguing that the AEDPA is

11  unconstitutional, and therefore should not be applied in his case.  (Dkt. No. 13 at 1.)  However,

12  as noted by respondent, both the United States Supreme Court, and the Court of Appeals for the

13  Ninth Circuit have addressed this issue.  In Williams v. Taylor, 529 U.S. 362, 460 (2000), the

14  Supreme Court stated that there is no separation of powers problem under a proper interpretation

15  of 28 U.S.C. § 2254(d)(1).  In Duhaime v. Ducharme, 200 F.3d 597 (9th Cir. 2000), the Ninth

16  Circuit found that the 1996 amendments to 28 U.S.C. § 2254(d)(1) do not offend the

17  Constitution.  See also Crater v. Galaza, 491 F.3d 1119, 1124-30 (9th Cir. 2007) ("the operative

18  provisions of the Act do not violate the Suspension Clause," because "Section 2254(d)(1) simply

19  modifies the preconditions for habeas relief, and does not remove all habeas jurisdiction.")

20  Therefore, petitioner's claim is unavailing.

21  V.  Conclusion

22            For all of the above reasons, respondent's motion to dismiss is granted.

23            IT IS HEREBY ORDERED that:

24            1.  Respondent's October 26, 2011 request to file an amended reply (dkt. no. 17)

25  is granted;

26            2.  Respondent's August 23, 2011 motion to dismiss (dkt. no. 9) is granted;

3.  This action is dismissed; and

4.  The court declines to issue a certificate of appealability under 28 U.S.C. § 2253.

DATED:  November 14, 2011

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

ston1605.mtd

16